## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

SHANITA HILL, as Special Administrator for
the Estate of AMARI SMITH,

       Plaintiff,

  v.

The CITY OF MILWAUKEE, WISCONSIN,
a municipal corporation; JEFFREY NORMAN,
individually and as agent of the City of
Milwaukee, Wisconsin; and FERNANDO
VENCES, individually and as agent of the City
of Milwaukee, Wisconsin,

       Defendants.

**<u>DEMAND FOR JURY TRIAL</u>**

---

## COMPLAINT

---

Plaintiff, Shanita Hill, as Special Administrator for the Estate of Amari Smith, by and through his attorneys, Hart McLaughlin & Eldridge, LLC, complains as follows against Defendants, CITY OF MILWAUKEE, WISCONSIN ("City of Milwaukee"), a municipal corporation; Milwaukee Police Department Chief of Police, JEFFREY NORMAN ("Chief Norman"), individually and as agent of the City of Milwaukee, Wisconsin; and FERNANDO VENCES ("P.O. Vences"), individually and as agent of the City of Milwaukee, Wisconsin.

## NATURE OF THE ACTION

1.      At approximately 6:19 p.m. on February 25, 2024, 30-year-old Amari Smith ("Smith") was lawfully driving his 2014 Mazda sedan northbound on N. 20th St. through its intersection with W. Burleigh St. in Milwaukee, Wisconsin when his vehicle was struck in a "T-bone" manner by a 2012 Acura sedan driven by Robert L. Jones ("Jones"), who had driven eastbound through the activated redlight signal and into Smith. The collision completely transected Smith's aorta, fractured his 1st through 7th left posterior ribs, lacerated the posterior lobe of his liver, and resulted in hemorrhage along his spine and neck. Smith was declared dead on the scene.



2. At the time of the collision, Jones was actively fleeing from Milwaukee Police Department ("MPD") P.O. Rizzo and P.O. Vences, who were pursuing Jones in a marked police vehicle after a failed attempt to perform a vehicle stop of Jones for a minor traffic infraction.

3. P.O. Rizzo and P.O. Vences had been assigned to the MPD's "Reckless Driving Initiative", and had elected to pursue Jones pursuant to MPD Standard Operating Procedure 660 ("SOP 660") – "VEHICLE PURSUITS AND EMERGENCY VEHICLE OPERATIONS" – based on their subjective interpretation that Jones had engaged in "reckless" driving as he fled.

4. Unfortunately, as the sordid history of MPD's SOP 660 revisions (addressed *infra*) reflects, the injury and death of innocent bystanders, including Smith, resulting from MPD police pursuits of "recklessly" fleeing vehicles in congested urban areas of Milwaukee was an obvious and predictable result of unconscionable policy declarations concerning vehicular police pursuits dating back to 2017 by the City of Milwaukee, through its agents and subdivisions, including Chief Norman and the Milwaukee Fire and Police Commission.

5. That the City of Milwaukee's deliberate indifference to the health and safety of Smith and other lawfully abiding Milwaukee citizens like him, as demonstrated in its formulation and implementation of SOP 660 and the "Reckless Driving Initiative", as well as the training and guidance provided to its law enforcement agents, including P.O. Rizzo and P.O. Vences, regarding the same, amounts to a violation of Smith's substantive due process rights pursuant to the 14th Amendment of the United States Constitution, and for which Shanita Hill now seeks recompense pursuant to 42 U.S.C. §1983.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the federal questions at issue pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, as well as supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

3

7.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Wisconsin.

## THE PARTIES

8.     Plaintiff and mother to Smith, Shanita Hill, was appointed as Special Administrator for the Estate of Amari Smith by the Circuit Court of Milwaukee on December 16, 2024, and has been a resident of Milwaukee, Wisconsin at all relevant times.

9.     Defendant City of Milwaukee, Wisconsin, is an incorporated municipal entity that controls, funds, operates, and superintends the MPD.

10.     Defendant, Chief Norman, was at all relevant times an agent of the MPD, and since December 23, 2020, has been the Chief of the MPD with final decision-making authority for MPD policy promulgation and implementation, and on information and belief, is a citizen of the State of Wisconsin.

11.     Defendant P.O. Vences is, on information and belief, a citizen of the State of Wisconsin and was at all relevant times an agent and employee of the MPD, operating in that capacity as a police officer.

## NOTABLE NON-PARTIES

12.     The Milwaukee Fire and Police Commission ("FPC") is a municipal subdivision of the City of Milwaukee made up of nine civilian commissioners that has operated continuously since it was established in 1885, and since at least 1911 has had significant operational oversight of the MPD. At all relevant times the FPC has had primary authority in appointing the Chief of the MPD. Between 1977 and June 2023, the FPC maintained supreme authority to dictate MPD policies relating to the control and management of the MPD, including SOP 660.

13.     Edward Flynn ("Chief Flynn") was the Chief of Police for the MPD from January 7, 2008, through February 16, 2018.

14.     Alfonso Morales ("Chief Morales") was the Chief of Police for the MPD from February 2018 through August 6, 2020.

15.     Demonico Rizzo ("P.O. Rizzo") is, on information and belief, a citizen of the State of Wisconsin and was at all relevant times an agent and employee of the MPD, operating in that capacity as a police officer. P.O. Rizzo was riding in the passenger seat of the cruiser driven by P.O. Vences at the time that P.O. Vences elected to initiate their pursuit of Jones on February 25, 2024.

## FACTS APPLICABLE TO ALL COUNTS

16.     For decades, policing experts and executives have been acutely aware of the unique dangers of pursuing suspects fleeing in motor vehicles. There has long been an essential consensus on a few notable conclusions regarding vehicle pursuits that attests to the imbalance between considerations of suspect apprehension and public safety: (1) that the majority of pursuits involve a stop for a mere traffic violation; (2) that, on average, one person dies in the United States every day as a direct consequence of a pursuit-related collision; and (3) that approximately 40% of persons injured or killed as a result of such pursuits are innocent bystanders.

17.     Similarly, it has been widely acknowledged that, given the common instinct amongst police officers to pursue and the inherent difficulty in making sound safety decisions within the context of an active pursuit, explicit departmental policies regarding such pursuits are of special significance. Such policies have variously been described as being on a spectrum ranging from "restrictive" to "discretionary," and although such characterizations are often of little value in the absence of specific context, in all instances such policies do tend to fall onto a spectrum with gradients distinguished by the scope of explicit justifications for engaging in a vehicle pursuit. While cost-benefit analysis of any given police department's police pursuit policy is necessarily a function of the unique characteristics of the community in which they are applicable, that analysis must be informed by

objective, empirical data. As described herein, the City of Milwaukee's failure to do so has constitutional implications.

THE ORIGINS OF MPD'S SOP 660

18.    Pursuant to City of Milwaukee General Order 2008-38 (Eff. August 21, 2008) (the "2008 Policy"), MPD's pre-existing Rules and Procedures Manual Section 3/660 "Vehicle Operation" section was renamed "Vehicle Pursuits", the purpose of which was to "establish guidelines for making decisions with regard to vehicular pursuit". A "Vehicle Pursuit" was defined by the then-amended policy as:

> "An active attempt by one or more law enforcement officers to apprehend a suspect operating a motor vehicle, while the suspect is trying to avoid capture by using high speed driving or other evasive tactics such as driving off a highway, making sudden or unexpected movements, or maintaining legal speed but willfully failing to yield to the officer's signal to stop."

19.    Pursuant to subsection 3/660.20(A) of the 2008 Policy:

"Vehicle pursuits are justified **only** when the police member knows **or has reasonable grounds to believe**:

1. The suspect presents a clear and immediate threat to the safety of others; or

2. The suspect has committed or is attempting to commit a serious offense[1]; or

3. The necessity of immediate apprehension outweighs the level of danger created by the vehicle pursuit, as in the case of a serious traffic violation such as OWI, reckless driving, etc." (Emphasis added)

20.    The 2008 Policy was amended on March 12, 2009, pursuant to General Order 2009-12 (the "2009 Policy"), which renumbered the "Vehicle Pursuits" policy as SOP 660 (as it has since been known through present day), but otherwise maintained the preceding substantive directives in identical form.

---

[1] Pursuant to the same policy, "Serious Offense" was defined as "A crime that involves an actual or threatened act, which a police member has probable cause to believe could result, or has resulted, in death or serious bodily injury and/or property loss."

6

21.     Between 2002 and 2009, there was an average of 211 annual vehicle pursuits by MPD.

<u>THE 2010 PURSUIT POLICY REVISION</u>

22.     In the first two months of 2010, at least four people across three incidents were killed by drivers fleeing from MPD pursuits, which persuaded then-MPD Chief Flynn to adopt a more restrictive vehicle pursuit policy, as dictated in General Order 2010-12, effective March 26, 2010 (the "2010 Policy").

23.     The most significant change evinced in the 2010 Policy concerned the aforementioned subsection 3/660.20(A) of the 2008 Policy, which was renumbered subsection 660.20(B). Subsection 660.20(B) of the 2010 Policy in relevant part read:

> "Vehicle pursuits are justified only when the police member <u>knows or has probable cause</u> to believe:
>
> 1.  The occupant(s) has committed, is committing, or is about to commit a violent felony (i.e., armed robbery, recklessly endangering safety, and other crimes against a person in which violence is an element to the felony offense); or
>
> 2.  The occupant(s) presents a clear and immediate threat to the safety of others and therefore the necessity of immediate apprehension outweighs the level of danger created by the vehicle pursuit." (Emphasis original)

24.     The most prominent effects of this revision were that: (1) the general justification standard was elevated from "reasonable grounds" to "probable cause"; (2) the "Serious Offense" justification was restricted to "violent felony"; and (3) "serious traffic violations such as OWI, reckless driving" were stricken as explicit examples of occasions in which "the necessity of immediate apprehension outweighs the level of danger created by the vehicle pursuit." Further clarifying the latter justification, a "**Note:**" provision to subsection 660.20(B) provided that such "**pursuits are NOT authorized solely for traffic infractions, ordinance violations, misdemeanors, non-violent felonies, <u>or based upon the mere fact that the vehicle is fleeing</u>**." (Emphasis original)

7

25. An "Analysis of March 26, 2010 MPD Vehicle Pursuit Policy Revision" was published by the FPC on November 15, 2010, which sought to evaluate the year-over-year effect of the 2010 Policy revision in relation to the same study period (March 26 – September 26) in 2009. Notably, the report concluded that, since the implementation of the 2010 Policy, the number of vehicle pursuits decreased by 44.9%, the average durations of pursuits decreased by 50%, the average maximum speed reached during pursuits decreased by 19%, the number of vehicle accidents decreased by 52%, and the number of injuries decreased by 63%, meanwhile "the number of suspects apprehended immediately following the pursuit only decreased by one-fifth (20%)." The report thus concluded that "[w]hile the overall number of pursuits and the number of suspects apprehended decreased after the pursuit policy change, the majority of variables that can be used to determine safety (number of accidents, officer injuries, suspect injuries, distance pursuit covered, maximum speed reached, methods used to terminate a pursuit, and time spend on a pursuit) decreased. Taking into consideration that the policy revision was focused on citizen safety and officer safety, the revisions to the vehicle pursuit policy have been successful."

26. A subsequent analysis published on July 7, 2011, presented a full year-over-year analysis of the 2010 Policy revision with nearly identical results to those articulated in the preceding paragraph, with the following exceptions: accidents decreased by nearly 62%, innocent bystander injuries decreased by 33%, officer injuries decreased by 86%, and suspect injuries decreased by nearly 70%. A similar conclusion by the FPC stated: "While the overall number of pursuits and suspects apprehended declined pursuant to the vehicle pursuit policy change, pursuits that did occur after the change could be deemed safer. The number of accidents and injuries to officers, suspects, and bystanders decreased, while the average speed and pursuit distances declined. The underlying cause of the pursuit policy revision was to ensure the safety of citizens and officers, and thus far, the policy revision has been successful."

8

27.    The next iteration of SOP 660 was issued on July 19, 2011 (the "2011 Policy"), however it included no substantive changes to any of the operative language cited from the 2010 Policy with the following exception: the last segment of the "**Note**" provision cited from Section 660.20(B) ("**, or based upon the mere fact that the vehicle is fleeing**.") was altered to read: "**. For the purpose of this policy, Fleeing an Officer (WI §346.04) is not considered a violent felony, therefore, pursuits are NOT authorized based solely on the fact that the vehicle is fleeing.**"

28.    Though this change is arguably neutral in substance, the mere fact of the amendment and the citation to state statute reflects a deliberate effort to resolve a perceived loophole or common misunderstanding of the 2010 Policy, and was doubtlessly intended to reaffirm that patrol officers' pursuits would be measured against the objective standards provided in the policy – rather than the officers having *carte blanche* to engage in pursuits merely because a suspect attempts to escape.

29.    Unsurprisingly, police pursuits in Milwaukee decreased substantially through this period, falling from 167 in 2009 to 68[2] in the 2010, then to 51[4] in 2011, before hitting its nadir at 50 pursuits in 2012.

30.    The next iteration of SOP 660, effective July 25, 2014, included no significant changes to the aforementioned operative provisions. Nor did the following revision, published and effective as of August 21, 2014.

31.    For unclear reasons, MPD vehicular pursuits increased to 81 in 2013, and climbed higher to 99 in 2014. The percentage of pursuits that hit speeds higher than 75 mph also increased from 2012's 10% figure to 24.7% and 22.2% for 2013 and 2014, respectively. The amount of pursuit-related vehicle collisions also increased from the 22 seen in 2012, to 26 in 2013 and 35 in 2014.

---

[2] As described *infra*, discordant data for the amount of vehicular pursuits and accidents is reflected in the FPC Vehicle Pursuit Report published on July 1, 2012, vis-à-vis all subsequent reports, starting with the 2016 FPC Report.

32. Many of the MPD patrol officers to whom SOP 660.20(B) applied resented its limitations on their discretion to pursue fleeing vehicles, and this was expressed to select advocates. The most prominent critics of the 2010 Policy and its various iterations over the ensuing five years were Michael Crivello, president of the Milwaukee Police Association union, and Robert "Bob" Donovan, the then-Alderman of the 8th District of Milwaukee ("Ald. Donovan"). In April of 2015, both publicly criticized the SOP 660 regime implemented by Chief Flynn in nearly identical terms, with Ald. Donovan quoted as saying "These criminals are literally thumbing their noses and flipping off officers as they drive off, knowing that officers will not pursue them"; while Mr. Crivello said: "They can literally flip the finger to an officer and take off hard and fast and get away with it."

33. In a letter to Chief Flynn, the Mayor of the City of Milwaukee, and the FPC (dated April 7, 2015), Ald. Donovan reported that – despite the absence of any data being formally published by the FPC – "I have it on good authority that, in the first three months of 2015 alone, there have been more than 750 instances in which officers would have pursued a suspected offender under the old policy but were forbidden from doing so under you March 2010 directive."

34. The most acute concern raised by Ald. Donovan and Mr. Crivello pertained to a perceived uptick in carjackings, which ultimately motivated the FPC to expand the justifications for pursuits to include not only *suspects*, but also *vehicles* involved in a violent felony. The major change came on June 29, 2015 (the "2015 Policy"), when SOP 660.20(B) was amended to read:

> "Vehicle pursuits are justified only when the police member knows or has probable cause to believe:
>
> 1. The occupant(s) has committed, is committing, or is about to commit a violent felony (e.g. armed robbery, recklessly endangering safety, and other crimes against a person in which violence is an inherent element to the felony offense): or
>
> 2. *The specific vehicle was used in or taken during the attempt or commission of a violent felony (e.g. armed robbery, recklessly endangering safety, and other crimes against a person in which violence is an element to the felony offense): or*

10

3. The *vehicle or* occupant(s) present a clear and immediate threat to the safety of others and therefore the necessity of immediate apprehension outweighs the level of danger created by the vehicle pursuit *(e.g., misdemeanor shots fired incident in which a specific vehicle is described as being involved).*

[…]

**Note: "Eluding / Fleeing" pursuits are not authorized solely for traffic infractions, ordinance violations, misdemeanors, or non-violent felonies. For the purpose of this policy, Fleeing an Officer (Wis. Stat. § 346.04) is not considered a violent felony, therefore, pursuits are not authorized based solely on the fact that the vehicle is fleeing."** (*Italics* added to emphasize revisions from August 21, 2014, Policy)

35.     It is noteworthy that, after July 1, 2012, the FPC did not publish another Vehicle Pursuit Report until 2017, wherein the FPC acknowledged that "Vehicle pursuits have been characterized by the US Justice Department as '… possibly the most dangerous of all ordinary police activities.'" The *2016 City of Milwaukee Fire and Police Commission Pursuit Report* ("2016 FPC Report")(published May 18, 2017) reflected that, since hitting its nadir of 50 pursuits in 2012, which increased to 81 and 99 in 2013 and 2014, respectively, attempted vehicle pursuits rose to 263 in 2015 (concurrent with the 2015 Policy expansion to also include *vehicles* involved in violent felonies), and to 306 pursuits in 2016.



36. Meanwhile, the rates of pursuits exceeding 75 mph, which was only 10% in 2012 and 24.7% and 22.2% in 2013 and 2014, respectively, rose to 32.7% in 2015, and 48% in 2016, with over 80% of 2016 pursuits exceeding 60 mph. "[F]or such a large percentage of pursuits to reach such high speeds", the FPC commented, "is a relatively recent phenomenon".

37. Unsurprisingly, as pursuits increased by 277% in 2016 relative to 2013, so too did pursuit-related accidents increase by 242%, and injuries to innocent bystanders increased by 250%, according to published FPC data. Meanwhile, the rate at which pursued subjects were actually apprehended steadily decreased from 91.2% in 2010, down to less than 40% in 2015 and 2016. As a result, in 2015 and 2016, a pursued suspect was less than 7.7% more likely (in absolute terms) to be apprehended than the pursuit itself was likely to result in an accident.

38. Other notable data reported by the FPC in 2017 pertained to MPD's utilization of "StarChase" technology – which essentially deploys a GPS monitor with a sticky coating that can be fired at a fleeing vehicle from a device affixed to MPD vehicles – and MPD's rates of issuing citations to owners of fleeing vehicles for whom complete license plate numbers could be identified. As the 2016 FPC Report indicates, this technology was utilized over 150 times during 2016 and successfully attached to the fleeing vehicle 72% of the time. Meanwhile, even in those instances in which the full license plate number for a successfully fleeing vehicle was identified, and Wis. Stat. § 346.175 permitted citations against owners of vehicles fleeing from attempted stop, the MPD only issued such citations less than 20% of the time.

39.     Notably, however, as of 2016 the FPC no longer reported on accidents and injuries sustained "after pursuits have been terminated", thereby visibly decreasing the perceived prevalence of pursuit-related harm. As a practical matter, this permitted MPD officers to "terminate" their pursuit mere moments prior to a crash and without resulting property damage or injuries being formally associated with the pursuit. For unclear reasons, this new accounting practice was applied retroactively in the 2016 FPC Report, but *only through 2010*[3]. The retroactive application of this new principle of analysis does not, however, explain why the 2016 FPC Report also revised downward the previously published reports on the number of *pursuits* in 2010 and 2011, from 91 to 68 for 2010, and 70 to 51 for 2011.



2011 Review                                    2016 Review

40.     Another dubious data set was presented in a separately published *Addendum* to the 2016 FPC Report, subtitled "Overview of Non-Pursuit Incidents". As of July 25, 2014, SOP 660 included reporting requirements for "non-pursuits", however (as the *Addendum* acknowledged) the reporting requirements evolved considerably between then and November 23, 2015, and therefore

---

[3] By comparison of the 2016 FPC Report to its most recent predecessor, published on July 1, 2012, the amount of "pursuit accidents" reported for calendar year 2010 was decreased from 32 to 26, and for 2011 from 20 to 17.

"year to year comparisons of Non-Pursuit data are not always possible or statistically meaningful." Nonetheless, the *Addendum* – the first and only of its kind published by the FPC – disclosed some concerning data suggesting an "increasing trend" in non-pursuits:



41.     As seen above, this data set suggests that in the five full months following the original "non-pursuit" reporting requirement in July of 2014, there was an average of 72.2 non-pursuits recorded per month. In 2015, that figure was 246.4, and in 2016, 359.75. Starting in January 2017, however, published FPC data suggests an astonishing and immediate deviation from historical trends. For example, non-pursuits reported by MPD officers spontaneously exploded to record levels (615 for January and 733 for February), representing an 83% increase compared to the 2016 monthly average.

42.     At the very same time, in January and February of 2017 only 21 total pursuits were recorded, which was lower than any other set of two months published since the implementation of the 2015 Policy and a nearly 59% decline compared to the monthly average from 2016.



43.     For any policymaker hoping to promote a tendentious narrative in support of loosening SOP 660 in early 2017, these are precisely the sort of data deviations they would hope to see. Likewise, for anyone with the same agenda and direct influence on the underlying data being recorded, these are precisely the sort of data deviations they would aim to produce.

POLITICAL PRESSURE BUILDS TO LOOSEN PURSUIT POLICY

44.     As if on cue, and prior to the publication of the 2016 FPC Report and its corresponding *Addendum*, 10th District Alderman Michael Murphy ("Ald. Murphy") solicited the MPD's Office of Management, Analysis & Planning to provide "[d]ata pertaining to vehicle pursuits that resulted from fleeing from January 1, 2012 to March 13, 2017". Though the request was quite vague, the limited data provided in response – which emphasized a 2017 YTD decrease of 62% in attempted pursuits and 94% increase in non-pursuits, compared to 2016 – was clearly targeted for striking effect.

| Vehicle Pursuits & Non-Pursuits by the Milwaukee Police Department | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Police Activity | 2012 | 2013 | 2014* | 2015* | 2016* | YTD 2016 | YTD 2017 | YTD % Change |
| Vehicle Pursuits | 49 | 82 | 102 | 263 | 305 | 71 | 27 | -62% |
| Non-Pursuits | 12 | 36 | 689 | 2,544 | 4,317 | 863 | 1,675 | 94% |

*Indicates both pursuit and non-pursuit data is not comparable due to policy changes or reporting practices.

45. In a letter to the FPC dated April 7, 2017, Ald. Murphy emphasized these data points and explicitly requested "that the FPC review and, if deemed appropriate, make modifications to the current pursuit policy because of the staggering statistics."

46. On April 19, 2017, Ald. Donovan held a "spirited" conversation with Chief Flynn regarding SOP 660, with Ald. Donovan remarking that Chief Flynn "staked out his position, and it is not aligned with mine nor with most of my colleagues."

47. The following day, April 20, 2017, Ald. Donovan published a letter jointly signed by him, Ald. Murphy, and 11 others of the 15 member Milwaukee Common Council urging the FPC to "re-prioritize traffic enforcement activity and to redraw [Police Chief Edward Flynn's] pursuit policy."

48. On June 7, 2017, the Board of the FPC Committee on Policies and Standards held a public meeting with Chief Flynn participating, at which time Flynn indicated that he had no intent of overhauling SOP 660.

49. June of 2017 also saw Milwaukee Police Association president Michael Crivello give multiple public interviews specifically excoriating the MPD's police pursuit policy and defending his officer-members' right not to be "forced to do something that goes against their moral" compass.

50. In a rare demonstration of dominant authority, on July 13, 2017, the FPC issued a written directive (the "2017 FPC Directive") to Chief Flynn, which was focused on two perceived social scourges: (a) the use of motor vehicles as primary locations for narcotics distribution; and (b) reckless driving. As for the latter, the FPC explained that, although:

"The current Standard Operating Procedure governing vehicle pursuits already allows for vehicular pursuits in instances in which the threat to the safety of others is outweighed by the level of danger created by the vehicle pursuit […it] does not clearly and unambiguously allow for vehicular pursuit in response to some reckless behaviors that are indeed extremely threatening to the safety of others and that indeed outweigh the level of danger created by the vehicle pursuit".

51.    Ultimately, the 2017 FPC Directive mandated three things: (1) that Chief Flynn establish a "high value target vehicle list" cataloging vehicles used for "mobile drug dealing" or which have fled police on multiple occasions; (2) to amend SOP 660 to permit pursuits of vehicles included in such list; and (3):

"That an additional change to Standard Operating Procedure 660 shall also include, but not be limited to, an amendment of section 660.20(B) allowing for police members to justifiably pursue fleeing vehicles when the police member knows or has probable cause to believe that the vehicle has engaged in *excessively* reckless driving including *excessive* speeding, reckless lane changes, and failure to stop at stop signals and signs". (Emphasis added)

52.    Finally, the 2017 FPC Directive stated: "BE IT FURTHER RESOLVED, that failure to comply with this directive may result in disciplinary action by the Board, including discharge, suspension without pay, or reduction in rank, pursuant to Sec. 62.50 Wis. Stats."

53.    The animosity between Chief Flynn and the FPC, as reflected in the 2017 FPC Directive, was no quiet affair. Indeed, in response to the FPC's directive, Chief Flynn gave a media interview where he explained his position, in relevant parts, as follows:

"Our current policy in the police profession is seen as a national model. I understand that a lot of people think the pursuit policy is the source of all the ills in the City of Milwaukee right now";

"I'm their expert. If the current policy doesn't pass their concerns, let us work together to craft an (sic) rational policy. Don't throw a bunch of random data points to me and expect me to craft a policy that works for professional standard […] I have an obligation to give them good advice – and I have not been afforded that opportunity."

"When I perceive the kind of hostility I saw last week, it worries me, because how do I overcome conclusions that I think are based on incorrect information? I believe my relationship with the commission has been poisoned, and I'm concerned about how they look at everything I do. I'm not fearful because I know I'm right";

The "bad public policy" endorsed by the FPC, Flynn asserted, would create "probably the least restrictive pursuit policy of any big city in the country."

54. Chief Flynn was not the only expert dismissed by the FPC. On August 6, 2017, Chuck Wexler, the Executive Director of the Police Executive Research Forum, published an op-ed in the Milwaukee Journal Sentinel entitled "**Don't revert to police pursuits that endanger the public**". Therein, Wexler commented:

> "Flynn's policies are well within the mainstream of national best practices in the policing profession […] Such policies limiting police pursuits have become accepted wisdom in the policing profession, and are not considered controversial outside of Milwaukee […] Milwaukee's current policy on police pursuits is supported by research and many years of experience in the cities that have such policies. And it is supported by logic and common sense […] If Milwaukee loosens its pursuit policy, it will be taking a major step backward, going against what forward-thinking police departments have been implementing for years. Strict pursuit policies have saved lives, and it will cost lives if Milwaukee reverses itself."

55. As if the staggeringly reduced pursuit figures from the first quarter of 2017 were not suspicious enough, further evidence of frontline MPD officers juicing the numbers to support a more discretionary policy was evident in the continuously skyrocketing non-pursuit figures, which at the peak of political pressure on Chief Flynn to loosen SOP 660 in August of 2017, hit an all-time high of 1016.



Case 2:26-cv-00316-LA    Filed 02/24/26    Page 18 of 33    Document 1

## THE 2017 PURSUIT POLICY REVISION

56.     The debate culminated in a revised SOP 660, effective as of September 22, 2017 (the

"2017 Policy"), which included the following notable amendments:

(1)  Seemingly as window dressing, a new subsection 660.10(F) substantially incorporated a
     number of pursuit consideration factors adopted from the International Association of
     Chiefs of Police (2015) Model Policy Guidelines on Vehicular Pursuits;

(2)  Omitted the word "only" from the previous subsection 660.20(C)'s "Vehicle pursuits are
     justified *only* when" (emphasis added), such that it read: "Vehicle pursuits are justified
     when the police member knows or has probable cause to believe:" and added new
     subsections 660.20(C)(4) and (5):

     "4. The occupant(s) of the vehicle are engaged in drug dealing proximate in time to the
     initiation of the vehicle pursuit.

     5. The necessity of immediate apprehension outweighs the level of danger created by the
     vehicle pursuit, *as in the case of the vehicle engaging in reckless driving.*" (Emphasis added)

(3)  The previous "**Note**", that "**pursuits are not authorized solely for traffic infractions,
     ordinance violations, misdemeanors, or non-violent felonies [… and that] pursuits
     are not authorized based solely on the fact that the vehicle is fleeing**" was omitted
     entirely.

57.     Although FPC Chairman Steven DeVougas[4] insisted, in reference to the 2017 Policy,

that "It isn't like we're giving officers license to chase people for minor vehicle infractions," as the

data from the ensuing years promptly and consistently demonstrated, that was exactly the effect.

## THE AFTERMATH

58.     The impact on pursuit figures was immediate, as the amount of MPD vehicle pursuits

in the last three months of 2017 was more than triple the average figure from the first 9 months of

the year (more than doubling the annual total up until that point). The total figure of 369 pursuits that

year was an all-time record for Milwaukee.

---

[4] Mr. DeVougas was subsequently demoted from his chairmanship in August of 2020, and ultimately resigned from the
FPC entirely in February of 2021, amidst an ethics violation investigation.

59. Despite having more than a year left on his contract, Chief Flynn, as well as his Assistant Chief, James Harpole, resigned effective February 16, 2018.

60. Chief Flynn was replaced by Chief Morales, who in June of 2018 held a press conference to reinforce the 2017 revision to SOP 660, exclaiming: "People have to know of the City of Milwaukee that we will chase and we are going to chase you."

61. Unsurprisingly, notwithstanding a record-setting 2017, in 2018 MPD's vehicle pursuits still increased by almost 155% year-over-year, jumping to a new record of 940 pursuits. Of those pursuits, a whopping 629 were justified on the grounds of the suspect engaging in "reckless driving" (66.9% of all pursuits). In other words, the dramatic increase in pursuits was *entirely* attributable to the new license provided to officers to pursue suspects they deemed guilty of "reckless driving".

62. The pursuits were also more dangerous. In 2018, more than half of the pursuits exceeded 75 mph, and 85.7% hit or exceeded 60 mph. The occurrence of pursuit-related accidents (once again, not accounting for accidents occurring "after pursuits have been terminated") increased from 23% in 2017 to 25.5% in 2018, and owing to the dramatic increase in pursuits, this meant that total pursuit-related accidents increased by no less than 182% (to 240). The total amount of pursuits resulting in injuries also increased by 226%, with pursuits resulting in innocent bystander injuries increasing by over 245%.

63. The suspect apprehension rate for MPD's pursuits, meanwhile, was still below 40% in 2018. And despite the fact that the only StarChase data ever publicly reported by the FPC indicated that it had been successfully deployed in 72% of attempts, the StarChase program was terminated by Chief Morales in 2019.

64. The immediate post-2017 Policy statistical trends continued in 2019 through 2022, with greater than 60% of pursuits attributed to "reckless driving", and the percentage of pursuits exceeding 75 mph steadily rising. In 2022, more than two-thirds of pursuits (67.7%) exceeded 75 mph.

Accidents and injury data remained alarming, and despite the fact that the "total number of accidents and injuries is limited to those reported in MPD vehicle pursuit reports," the City of Milwaukee was aware since 2017 that pursuit speeds in excess of 75 mph had a .95 correlation coefficient with injuries to innocent bystanders.

65. Nonetheless, under the stewardship of the Defendant, Chief Norman, the MPD doubled down on giving its officers carte blanche to pursue fleeing suspects, as exemplified in its July 22, 2022, SOP 660 Policy revision, which then included a new "**Note**" beneath subsection 660.20(C)(5) which stated: "**Members may initiate a vehicle pursuit for either (1) reckless driving observed by the member prior to the initiation of a traffic stop or (2) if the suspect vehicle flees while driving in a reckless manner after an attempted vehicle stop for any state law or ordinance violation.**" (Emphasis original)

66. Unsurprisingly, 2023 saw MPD hit an all-time record of 1081 pursuit that year.

67. That same year also saw the publication of a DOJ-sponsored report drafted by the Police Executive Research Forum and published by the U.S. Department of Transportation and National Highway Traffic Safety Administration entitled *Vehicular Pursuits: A Guide for Law Enforcement Executives on Managing the Associated Risks*. In a foreword to the report, the Director of the Office of Community Oriented Policing Services, Hugh T. Clements, Jr., reaffirmed the police executive consensus, that: "Despite what we see in popular culture, the high-speed chase is not—nor should it be—a routine part of law enforcement work. The safety of fleeing suspects, their passengers, pursuing

officers, and uninvolved bystanders are too important to risk on a regular basis." The 144-page report

took special aim at the City of Milwaukee's SOP 660:



**Milwaukee (Wisconsin) Police Department—Pursuit Policy Revisions between 2010 and 2017**

In 2009, three separate police vehicle pursuits in Milwaukee, Wisconsin, resulted in the deaths of four innocent bystanders.* These tragic incidents caused the Milwaukee Police Department (MPD) to reassess how it approached vehicle pursuits and resulted in the adoption of a new, more restrictive policy in March 2010.†

Following implementation of the new policy, the number of pursuits fell by 59 percent, from 167 in 2009 to 68 in 2010, the largest decline since 2002.‡ As would be expected, the number of pursuits resulting in injury or death also declined.

After several years of this restrictive policy, however, MPD began to allow pursuits in additional situations. Many of these changes were based on increases in certain crime categories and community concerns.

As each new category was added, the total number of pursuits rose. In June 2015, for example, the policy was amended to authorize pursuits for carjackings;§ total pursuits increased by 166 percent that year (from 99 to 263). In September 2017, the policy was revised again to permit pursuits for reckless driving and vehicle-based drug dealing; total pursuits increased more than 150 percent the following year (from 369 to 940). This increase mostly reflected the large number of pursuits for reckless driving, which made up 67 percent of the 2018 total.

Not surprisingly, as the number of pursuits increased, the numbers of injuries and deaths did as well. The fatalities included a Milwaukee police officer who was killed in a crash while pursuing a reckless driver.** Officer Charles Irvine, Jr., was the first Milwaukee officer killed in the line of duty since 1996.

68.     The DOJ-sponsored Report also made specific reference to the risks occasioned by

Milwaukee's SOP 660's permissive approach to pursuits justified by reckless driving:

> "Increases in crime, particularly in certain types of crimes such as reckless driving or vehicle thefts, may heighten the public's fear and put pressure on an agency's leaders to loosen a restrictive policy. While it is always important to be responsive to the community's desires, agencies should not revert to policies that take on more risks than potential rewards without first explaining to the community the potential consequences of that action.

> For example, allowing officers to initiate pursuits for reckless driving will increase the number of vehicle pursuits, which in turn will increase the number or injuries and deaths to suspects, officers, and bystanders. The Milwaukee (Wisconsin) Police Department serves as a real-world example. Following revisions to the agency's policy allowing pursuits for reckless driving and vehicle-based drug dealing, pursuits increased sharply from 369 in 2017 to 940 in 2018. Pursuits for reckless driving, which represented 67% of all pursuits in 2018, were the primary reason for the increase. Pursuit-related injuries—to suspects, officers, and third parties—also increased significantly, by at least 200 percent."

<u>THE DEATH OF AMARI SMITH</u>

69.     On February 25, 2024, Smith, age 30, was killed in a motor vehicle crash at 6:19 p.m. at the intersection of N. 20th Street and West Burleigh in the City of Milwaukee, Wisconsin (the "Intersection").

70.     Immediately prior to the collision, Smith was driving a gray 2014 Mazda 6 northbound on N. 20th Street when he was struck in the Intersection by a 2012 silver Acura TL sedan vehicle driven by an individual named Robert Jones.

71.     As he entered the Intersection, Smith had the right of way and was not in violation of any traffic laws.

72.     In the minutes prior to the collision between Smith's vehicle and the silver Acura, MPD P.O. Vences and P.O. Rizzo were on patrol as part of a "violent crime direct patrol mission" when they encountered the vehicle driven by Jones, the black male operator of the Acura TL sedan.

73.     P.O Vences and P.O. Rizzo were in the driver's seat and passenger seat of their marked patrol vehicle at the time that they engaged with the silver Acura and through the crash resulting from their pursuit of it.

74.     According to P.O. Rizzo, the Acura was traveling southbound in the 3100 Block of N. 37th Street when he observed it traveling at "approximately 35-40 mph," or 5-10 m.p.h. over the speed limit for the area.

75.     P.O. Vences then followed the Acura as it turned eastbound onto Burleigh St. from 27th street and where he "paced" the vehicle for "approximately two blocks […] traveling approximately 45 m.p.h." when he attempted to make a traffic stop.

76.     The silver Acura initially came to a temporary halt after P.O. Vences activated the light bar before it merged back into traffic on W. Burleigh and immediately began accelerating away to gain distance between it and the squad.

77. Despite the silver Acura being only suspected of a traffic offense, P.O. Vences engaged in pursuit of the vehicle and chased after it at a high rate of speed through a dense urban neighborhood.

78. As P.O. Vences initiated pursuit, P.O. Rizzo went on the air and broadcast the pursuit.

79. P.O. Vences then "corrected" P.O. Rizzo stating that the event was a "non-pursuit," but continued to drive at a high rate of speed with his emergency light bar activated.

80. P.O. Rizzo informed dispatch the event was a "non-pursuit," but only as the crash was occurring.



81. Immediately prior to the collision, Jones was speeding away from the pursuit of his vehicle by MPD P.O. Vences.



82. In order to escape the pursuit of P.O. Vences, Jones drove the Acura through a red traffic signal at the Intersection without stopping or slowing down and struck Smith's vehicle in a T-bone collision.

83. The force of the impact was violent and caused Smith's vehicle to spin and go off the roadway and collide with a gas station at the corner of the Intersection.

84. After observing the crash occur, P.O. Vences slowed his vehicle on approach to the intersection and arrived at the corner approximately five seconds after the collision.



Case 2:26-cv-00316-LA    Filed 02/24/26    Page 25 of 33    Document 1

85.     After the crash, Jones fled from his crashed vehicle and P.O. Vences and P.O. Rizzo chased after him on foot without checking on Smith at the scene of the violent crash.

86.     The impact resulted in transection of Smith's aorta, fractured his 1st through 7th left posterior ribs, lacerated the posterior lobe of his liver, resulted in hemorrhage along his spine and neck, and Smith was declared dead of blunt force injuries on scene.

## 2026: MPD REVISES SOP 660 IN RESPONSE TO DEATH OF INNOCENT BYSTANDERS

87.     Between January and October of 2025, nine people – including six innocent bystanders – were killed in MPD pursuit-related accidents. This created political pressure on Chief Norman to revise SOP 660 in order to make the pursuit policy more restrictive. Ultimately, this led a revision of SOP 660 effective February 6, 2026, with the most significant amendment being that MPD pursuits founded on "reckless driving" could no longer be justified based on the fleeing suspect's excessive speed alone.

88.     Had such a policy been in place and followed by P.O. Vences in February of 2024, the pursuit of Jones, which resulted in the collision with Smith, would have ever occurred.

89.     As reported around the time that the February 6, 2026, SOP 660 revision was announced, MPD is also planning to revive its StarChase program later this spring.

### COUNT 1
### 42 U.S.C. §1983 – *Monell* Claim – Substantive Due Process Violation
### (City of Milwaukee)

90.     Plaintiff incorporates the foregoing paragraphs as if full set forth herein.

91.     That at all relevant times between September 22, 2017, and February 26, 2024, the Defendant, City of Milwaukee, by and through its employees, agents, and subdivisions, including the FPC and the MPD, generated, published, and instituted a formal and explicit vehicle pursuit policy (SOP 660) that actively encouraged MPD officers to dangerously pursue vehicles fleeing from

attempted stops in the event that the officer subjectively deemed the fleeing suspect's driving to be "reckless".

92. That the Defendant, City of Milwaukee, by and through its employees, agents, and subdivisions, including the FPC and the MPD, knew or should have known at all relevant times that the aforementioned revisions to SOP 660 effective September 22, 2017, and added or maintained through February 26, 2024:

(1) Would and did result in a drastic increase in vehicle pursuits, average speeds of pursuits, vehicle accidents, property damage, injuries, and deaths to fleeing suspects, police officers, and innocent bystanders, without a correspondingly justifiable benefit in criminal apprehensions or reduction in crime;

(2) Were founded on inaccurate and/or systematically adulterated data, that deliberately and artificially obscured the true extent of suspect vehicle flight, MPD vehicle pursuits, and pursuit-related accidents, property damage, injuries, and fatalities;

(3) Were contrary to prevailing consensus amongst policing experts and authorities, including its own Chief of Police, Edward Flynn, with respect to vehicle pursuit policies and strategies in metropolitan areas; and

(4) Did not fairly account for apprehension alternatives to vehicle pursuit, including by use of StarChase technology or subsequent investigation of fleeing vehicles.

93. That at all relevant times between September 22, 2017, and February 26, 2024, the Defendant, City of Milwaukee, by and through its employees, agents, and subdivisions, including the MPD, failed to adequately educate, train, supervise, and enforce officer discipline with regard to:

(1) The specific maneuvers and/or characteristics of fleeing suspect driving behavior that would amount to "reckless driving" sufficient to justify a vehicle pursuit under the terms of SOP 660;

(2) Other factors militating against vehicle pursuits, despite officers' subjective perception of a fleeing driver engaging in "reckless driving";

(3) The implementation of the "Reckless Driving Initiative" amongst officers; and

(4) The implementation of alternative suspect apprehension methods, including through its StarChase pilot program or subsequent investigation of fleeing vehicles/suspects.

94. That independently and in conjunction, the aforementioned deficiencies reflect deliberate indifference by the Defendant, City of Milwaukee, to the safety and lives of fleeing suspects, officers, and innocent bystanders, including Amari Smith, in a manner that shocks the conscience.

95. That in doing so, the Defendant, City of Milwaukee, generated a state-created danger to innocent bystanders, including Amari Smith, both from its own officers engaging in vehicle pursuits and suspects fleeing from said pursuits.

96. That based on the data available, the aforementioned deficiencies were the proximate cause and moving force behind P.O. Rizzo's and P.O. Vences's decision to pursue Jones on February 25, 2024.

97. That as a direct and proximate result of P.O. Rizzo's and P.O. Vences's decision to pursue Jones on February 25, 2024, Jones fled at a high rate of speed, entered the intersection of N. 20th St. and W. Burleigh contrary to traffic signals, and struck the vehicle lawfully driven by Amari Smith, who died as a consequence of his injuries at the scene.

98. As a consequence, the Defendant, City of Milwaukee, is liable for violating Amari Smith's substantive due process rights, for which Plaintiff demands judgment for compensatory damages, punitive damages, costs, disbursements, attorneys' fees, interest, and any other relief that this Court deems just.

## COUNT 2
### 42 U.S.C. §1983 – Individual Liability – Substantive Due Process Violation
### (Chief Jeffrey Norman)

99. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

100. The Defendant, Jeffrey Norman, under color of law and within the scope of his employment with the MPD, a subdivision of the Defendant, City of Milwaukee, violated the substantive due process rights of Amari Smith as further delineated herein.

101.    That at all relevant times between December 23, 2020, and June 20, 2023, the Defendant, Jeffrey Norman, had primary authority to dictate the specific terms of MPD's SOP 660, and served as a primary source for advice and information with regard to SOP reviews and approvals by the FPC.

102.    That at all relevant times between June 20, 2023, and February 26, 2024, the Defendant, Jeffrey Norman, had supreme and unilateral authority to dictate the specific terms of MPD's SOP 660.

103.    That at all relevant times between December 23, 2020, and February 26, 2024, the Defendant, Jeffrey Norman, had supreme and unilateral authority to dictate officer education, training, supervision, and discipline with respect to the implementation of SOP 660, the "Reckless Driving Initiative", and alternative methods of fleeing suspect apprehension, including by use of StarChase technology and/or subsequent investigation of fleeing vehicles/suspects.

104.    That the Defendant, Jeffrey Norman, knew or should have known at all relevant times that the aforementioned revisions to SOP 660 effective September 22, 2017, and added or maintained by him through February 26, 2024:

(1) Had resulted and continued to result in a drastic increase in vehicle pursuits, average speeds of pursuits, vehicle accidents, property damage, injuries, and deaths to fleeing suspects, police officers, and innocent bystanders, without a correspondingly justifiable benefit in criminal apprehensions or reduction in crime;

(2) Were founded on inaccurate and/or systematically adulterated data, that deliberately and artificially obscured the true extent of suspect vehicle flight, MPD vehicle pursuits, and pursuit-related accidents, property damage, injuries, and fatalities;

(3) Were contrary to prevailing consensus amongst policing experts and authorities, including by MPD's former Chief of Police, Edward Flynn, with respect to vehicle pursuit policies and strategies in metropolitan areas; and

(4) Did not fairly account for apprehension alternatives to vehicle pursuit, including by use of StarChase technology or subsequent investigation of fleeing vehicles.

105.   That at all relevant times between December 23, 2020, and February 26, 2024, the Defendant, Jeffrey Norman, failed to adequately educate, train, supervise, and enforce officer discipline with regard to:

(1) The specific maneuvers and/or characteristics of fleeing suspect driving behavior that would amount to "reckless driving" sufficient to justify a vehicle pursuit under the terms of SOP 660;

(2) Other factors militating against vehicle pursuits, despite officers' subjective perception of a fleeing driver engaging in "reckless driving";

(3) The implementation of the "Reckless Driving Initiative" amongst officers; and

(4) The implementation of alternative suspect apprehension methods, including through its StarChase pilot program or subsequent investigation of fleeing vehicles/suspects.

106.   That independently and in conjunction, the aforementioned deficiencies and failure to correct said deficiencies reflect deliberate indifference by the Defendant, Jeffrey Norman, to the safety and lives of fleeing suspects, officers, and innocent bystanders, including Amari Smith, in a manner that shocks the conscience.

107.   That in doing so, the Defendant, Jeffrey Norman, generated a state-created danger to innocent bystanders, including Amari Smith, both from the officers in his command engaging in vehicle pursuits and suspects fleeing from said pursuits.

108.   That based on the data available, the failure to correct these deficiencies was/were the proximate cause and moving force behind P.O. Rizzo's and P.O. Vences's decision to pursue Jones on February 25, 2024.

109.   That as a direct and proximate result of P.O. Rizzo's and P.O. Vences's decision to pursue Jones on February 25, 2024, Jones fled at a high rate of speed, entered the intersection of N. 20th St. and W. Burleigh contrary to traffic signals, and struck the vehicle lawfully driven by Amari Smith, who died as a consequence of his injuries at the scene.

110. As a consequence, the Defendant, Jeffrey Norman, is liable for violating Amari Smith's substantive due process rights, for which Plaintiff demands judgment for compensatory damages, punitive damages, costs, disbursements, attorneys' fees, interest, and any other relief that this Court deems just.

## COUNT 3
### 42 U.S.C. §1983 – Individual Liability – Substantive Due Process Violation
### (Fernando Vences)

111. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

112. Defendant, P.O. Vences, under color of law and within the scope of his employment with the MPD, a subdivision of the Defendant, City of Milwaukee, deprived Amari Smith of his substantive due process rights in one or more of the following ways:

(1) Pursued an offender for nothing more than a minor traffic offense while knowing that the risks related to pursuing where extremely high and carried with it the risk of death or serious bodily injury, greatly exceeding any need to immediately apprehend the suspected traffic violator;

(2) Drove at excessive rates of speed in close proximity to the fleeing offender with lights and sirens activated, thereby increasing the likelihood that the offender would drive at faster speeds and engage in riskier driving behavior despite having no justification to engage in the extreme and dangerous behavior;

(3) Initiated pursuit in a dense urban area when the alleged violator had committed no offense other than speeding at 10-15 miles per hour over the limit creating a dangerous pursuit that was likely to result in serious injury or death.

113. As a direct and proximate result of one or more of the aforementioned deficiencies, Amari Smith was struck and killed by a vehicle driven Jones, who the Defendant, P.O. Vences, was pursuing at the time.

114. The Defendant, P.O. Vences, performed or omitted the above-described acts under color of law, with deliberate indifference to the clearly established rights of innocent bystanders, including Amari Smith, and in a manner that shocks the conscience and which no reasonable police officer, including P.O. Vences could have believed was lawful at the relevant times.

115. As a consequence, the Defendant, P.O. Vences, is liable for violating Amari Smith's substantive due process rights, for which Plaintiff demands judgment for compensatory damages, punitive damages, costs, disbursements, attorneys' fees, interest, and any other relief that this Court deems just.

## COUNT 4
### State Law Claim – Indemnification
### (City of Milwaukee)

116. Plaintiff incorporates the foregoing allegations as if fully restated herein.

117. Wisconsin law, pursuant Wis. Stat. §895.46, provides that public entities shall pay any tort judgment for compensatory damages for which its officers or employers are liable within the scope of their employment activities.

118. The Defendants, Jeffrey Norman, P.O. Rizzo, and P.O. Vences, were employees of the MPD, a subdivision of the Defendant, City of Milwaukee, and acted within the scope of their employment in committing the misconduct described herein.

## PRAYER FOR RELIEF

Plaintiff, Shanita Hill, as Special Administrator for the Estate of Amari Smith, by and through his attorneys, Hart McLaughlin & Eldridge, LLC, hereby requests judgment for the following relief from the Court:

(a) Compensatory damages against all Defendants in an amount to be determined by a jury;

(b) Punitive damages against all individual Defendants in an amount to be determined by a jury;

(c) Pre-judgment and post-judgment interest as allowable by law and as ordered by the Court;

(d) Attorneys' fees as allowable by the law and as ordered by the Court;

(e) Reasonable costs; and

(f) Such other relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiff, Shanita Hill, demands a trial by jury of all claims made herein.

Date: February 24, 2026

SHANITA HILL

*/s/ Sean O'Malley*

Counsel for Plaintiff

Steven A. Hart
James Ormond*
Sean O'Malley
**Hart McLaughlin & Eldridge, LLC**
One South Dearborn, Suite 1400
Chicago, IL 60603
P: (312) 955-0545
shart@hmelegal.com
jormond@hmelegal.com
somalley@hmelegal.com

*Pro hac vice admission forthcoming