# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SHANITA HILL,**
**Plaintiff,**

**v.** **Case No. 26-CV-316**

**CITY OF MILWAUKEE, et al.,**
**Defendant.**

---

## ORDER

On February 25, 2024, a vehicle pursued by two Milwaukee Police Department ("MPD") officers ran a red light at a high speed and T-boned a vehicle operated by Amari Smith, killing him. This case is about his senseless and potentially preventable death.[1] Plaintiff Shanita Hill, special administrator for Smith's estate, alleges that the City of Milwaukee ("the City") drafted, implemented, and maintained a police vehicle pursuit

---

[1] Smith's death is, unfortunately, not a rare consequence of police vehicle pursuits in Milwaukee. Purely for the purpose of context and thoroughness, I take judicial notice of a substantial body of work produced by the Milwaukee Journal Sentinel on the frequency and deadliness of police vehicle pursuits in the City. *See, e.g.,* David Clarey, *Milwaukee police chases continue to reach extremely high speeds*, MILWAUKEE J. SENTINEL (May 26, 2026), https://www.jsonline.com/story/news/crime/2026/05/26/milwaukee-police-chases-continue-to-reach-extremely-high-speeds/90219970007/; Tamia Fowlkes, *Family of rideshare driver killed in police chase sues MPD and city*, MILWAUKEE J. SENTINEL (Sept. 26, 2026), https://www.jsonline.com/story/news/local/milwaukee/2026/09/26/family-of-man-28-killed-in-police-chase-sues-milwaukee-police-city/91957882007/; Drake Bentley, *Has'an Harris was driving to get tacos in Milwaukee. He died when a police chase ended in a crash*, MILWAUKEE J. SENTINEL (Sept. 23, 2025), https://www.jsonline.com/story/news/crime/2025/09/23/a-milwaukee-womans-fight-to-limit-victims-in-police-chases/86284480007/; Jack Albright & David Clarey, *Police chases are not rare in Milwaukee. Lately, they've been deadly*, MILWAUKEE J. SENTINEL (Aug. 8, 2025), https://www.jsonline.com/story/news/2025/08/08/police-chases-are-not-rare-in-milwaukee-lately-theyve-been-deadly/85557686007/; Claudia Levens, *Another Milwaukee police chase has ended in a deadly crash; suspect remains at large*, MILWAUKEE J. SENTINEL (Aug. 24, 2025), https://www.jsonline.com/story/news/2025/08/24/milwaukee-car-chase-ends-in-fatal-crash-the-5th-such-incident-in-2025/85806667007/; Drake Bentley, *17-year-old dies in car fire after fleeing Milwaukee police, crashing into tree, police say*, MILWAUKEE J. SENTINEL (Aug. 6, 2025), https://www.jsonline.com/story/news/2025/08/06/1-death-2-injured-milwaukee-police-officers-following-car-fire/85552640007/; Jack Albright, *One dead, one arrested following police chase of reckless driver near Milwaukee's Brady Street*, MILWAUKEE J. SENTINEL (July 30, 2025), https://www.jsonline.com/story/news/2025/07/30/reckless-driver-arrested-after-causing-fatal-crash-during-police-chase/85435849007/.

policy with deliberate indifference to the known risks to bystanders such as Smith. She alleges that MPD Officer Fernando Vences, who was behind the wheel of the pursuing police vehicle, and MPD Police Chief Jeffrey Norman violated Smith's rights in their personal capacities. Plaintiff also brings a *Monell* claim against the City for creating and maintaining a vehicle pursuit policy that unconstitutionally deprived Smith of his substantive due process rights and for failing to provide adequate training, supervision, and enforcement of the vehicle pursuit policy. Before me now is defendants' motion to dismiss. I find that plaintiff cannot sustain a claim against Officer Vences or Chief Norman in their individual capacities, but that she has sufficiently stated an independent claim against the City and Chief Norman in his official capacity.

## I. BACKGROUND

These facts are largely taken from the complaint. For the purposes of a motion to dismiss, I accept well-pleaded facts as true. *McCauley v. City of Chicago,* 671 F.3d 611, 616 (7th Cir. 2011). However, in conjunction with the motion to dismiss, defendants submitted the video from the dashboard camera ("dashcam") in Officer Vences's police vehicle. In the complaint, plaintiff references and provides still shots of that video. Therefore, I may consider the video evidence, only preferring the video evidence to the allegations in the complaint when the facts alleged are "clearly, definitively, and uncontrovertibly contradicted by video footage." *Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024).

### A. The Fatal Incident

On February 25, 2024, two MPD officers, Fernando Vences and Domenico Rizzo, were out on patrol in a police vehicle. ECF No. 1, ¶ 72. At 6:18 p.m., the officers saw a

vehicle traveling between 35 and 40 miles per hour, approximately five to ten miles over the speed limit. *Id.* ¶ 74. Officer Vences, who was behind the wheel, observed the vehicle by "pacing," or following, it for about two blocks at approximately 45 miles per hour. *Id.* ¶ 75. At 6:18:50 p.m., Officer Vences activated his lights and sirens, attempting to pull the vehicle over. *Id.* ¶¶ 75–76; ECF No. 13, Vences Aff., Ex. 1, Dashcam Video at 18:18:50. At 6:18:53 p.m., the vehicle briefly stopped as if acquiescing to Officer Vences, but then suddenly accelerated and fled. ECF No. 1, ¶ 76; Video at 18:18:53. Officer Vences attempted to chase the vehicle, but it continued to increase its speed and distance from the police vehicle. ECF No. 1, ¶ 76. Officer Rizzo then broadcast that they were in pursuit of a vehicle, but Officer Vences immediately corrected him, stating, "no, no, no, non-pursuit, non-pursuit." *Id*. ¶¶ 78–79; Video at 18:19:04–18:19:08. Officer Rizzo then informed dispatch that the event was a non-pursuit. *Id*. ¶ 80; Video at 18:19:08–18:19:10.

At 6:19:09 p.m., the fleeing vehicle approached an intersection, ran a red light, and collided with a vehicle operated by Amari Smith. ECF No. 1, ¶ 82; Video at 18:19:09. The driver of the fleeing vehicle fled on foot. ECF No. 1, ¶ 85. At 6:19:16 p.m., Officer Vences arrived at the intersection in his police vehicle, saw the driver flee, and used his radio to report the accident. ECF No. 1, ¶¶ 84–85; Video at 18:19:16. At that point, Officers Vences and Rizzo left the scene of the accident to chase the driver who fled.[2] *Id.* Additional officers and emergency medical services personnel began to arrive on the scene to check on Smith between approximately 6:21:24 p.m. and 6:22:54 p.m. Video at

[2] In the motion to dismiss, defendants assert that the fleeing individual was apprehended "shortly thereafter," but this information is not contained in the complaint and cannot be seen in the video. ECF No. 12 at 2.

18:21:24–18:22:54 p.m. Smith was declared dead of blunt force injuries at the scene. ECF No. 1, ¶ 86. He fractured seven ribs, lacerated the posterior lobe of his liver, and transected his aorta, resulting in hemorrhage along his spine and neck. *Id*.

**B. The City's Vehicle Pursuit Policy**

Plaintiff spends a considerable portion of the complaint describing the history of the MPD vehicle pursuit policy. *See id.* at 6–22. The perils associated with police vehicle pursuits are not unique to Milwaukee: on average one person per day dies in the United States as a consequence of a pursuit-related collision, and approximately 40% of persons injured or killed for pursuit-related reasons are innocent bystanders. *Id*. ¶ 16. Concerns about these issues led to the first iteration of the MPD vehicle pursuit policy in 2008. *Id*. ¶ 18. It justified vehicle pursuits only if the pursuing officer knew or had reasonable grounds to believe (1) the fleeing individual presented a clear and immediate threat to the safety of others, (2) the fleeing individual had committed or was attempting to commit a serious offense, or (3) the necessity of immediate apprehension outweighed the danger created by the pursuit, as in the case of a serious traffic violation such as OWI, or reckless driving. *Id*. ¶ 19.

In 2010, then-MPD Chief Edward Flynn tightened the reigns on police vehicle pursuits, changing the policy so that officers needed "probable cause," rather than "reasonable grounds" to initiate a pursuit. *Id*. ¶ 23. It also explicitly provided that "**pursuits are NOT authorized solely for traffic infractions, ordinance violations, misdemeanors, non-violent felonies, or based upon the mere fact that the vehicle is fleeing**" (emphasis in original). *Id*. ¶ 24. The Milwaukee Fire and Police Commission ("FPC"), which until 2023 maintained "supreme authority to dictate MPD policies relating

to the control and management of the MPD," including the vehicle pursuit policy, conducted a study on the effect of the 2010 change. *Id*. ¶¶ 12, 25. The FPC found that the change significantly decreased the number of vehicle pursuits, the average duration of pursuits, the average maximum speed reached during pursuits, the number of vehicle accidents, and the number of injuries, while only having a small negative effect on the number of suspects apprehended. *Id*. at ¶ 25. Ultimately, it concluded that the revisions "have been successful." *Id*. A follow-up analysis confirmed these results. *Id*. ¶ 26.

In 2011, the policy was changed again to emphasize that fleeing an officer is not justification for a vehicle pursuit. *Id*. ¶ 27. Accordingly, the number of vehicle pursuits fell through 2012. *Id*. ¶ 29. However, despite no significant changes to the pursuit policy, pursuits began to rise again through 2013 and 2014 for unknown reasons. *Id*. ¶¶ 30–31.

Then, in 2015, the policy changed again. This began a trend of continuously loosening and relaxing the policy for approximately the next decade. Around this time, MPD patrol officers came to resent the policy's limitations on their discretion to pursue fleeing vehicles, and expressed these concerns to certain advocates. *Id*. ¶ 32. Milwaukee Police Association union president Michael Crivello and 8th District of Milwaukee Alderman Robert Donovan took up the mantle, publicly criticizing the policy. *Id*. Alderman Donovan was quoted saying, "[t]hese criminals are literally thumbing their noses and flipping off officers as they drive off, knowing that officers will not pursue them." *Id*. President Crivello similarly stated, "[the fleeing suspects] can literally flip the finger to an officer and take off hard and fast and get away with it." *Id*. Alderman Donovan went so far as to allege to Chief Flynn, the Mayor of the City of Milwaukee, and the FPC that he "ha[d] it on good authority that, in the first three months of 2015 alone, there [were] more than

750 instances in which officers would have pursued a suspected offender under the old policy but were forbidden from doing so under [the] March 2010 [policy].” *Id*. ¶ 33.

As a result of their advocacy and their explicit desire to increase the number of vehicle pursuits, the FPC expanded the justifications for pursuits. *Id*. ¶ 34. The new policy maintained language that pursuits “**are not authorized solely for traffic infractions, ordinance violations, misdemeanors, or non-violent felonies**.” *Id*. (emphasis in original). However, officers were now permitted to initiate vehicle pursuits if the officer had probable cause to believe the vehicle itself was involved in a violent felony, irrespective of whether the occupants of the vehicle were involved. *Id*.

This adjustment led to a rise in vehicle pursuits, just as the advocates desired. In 2017, the FPC published a report reflecting an increase in vehicle pursuits, a 242% increase in pursuit-related accidents from 2013 to 2016 and a 250% increase in injuries to innocent bystanders from 2013 to 2016. *Id*. ¶ 37. However, despite the increase in vehicle pursuits, the likelihood of apprehension resulting from a vehicle chase actually *decreased*. *Id*. The report also acknowledged that “[v]ehicle pursuits have been characterized by the US Justice Department as ‘. . . possibly the most dangerous of all ordinary police activities.’” *Id*. ¶ 35. But even though pursuits were becoming more common, less safe, and less effective, political pressure to further loosen the policy continued to mount. In fact, Alderman Donovan, another alderman Michael Murphy, and 11 others of the 15-member Milwaukee Common Council urged the FPC to “re-prioritize traffic enforcement activity and redraw [the] pursuit policy.” *Id*. ¶ 47.

Chief Flynn declined to change the pursuit policy. *Id.* ¶ 48. Nonetheless, the FPC issued a directive mandating Chief Flynn to change the pursuit policy, based on concerns

that vehicles were increasingly being used to deal drugs and a perceived uptick in reckless driving. *Id*. ¶ 50. The directive included three mandates: (1) create a vehicle list for vehicles used for mobile drug dealing or which have fled police on multiple occasions, (2) permit pursuits of those vehicles, and (3) amend the pursuit policy to allow police to pursue vehicles when police "know[] or ha[ve] probable cause to believe that the vehicle has engaged in excessively reckless driving including excessive speeding, reckless lane changes, and failure to stop at stop signals and signs." *Id*. ¶ 51. The FPC threatened Chief Flynn with disciplinary action, including discharge, suspension without pay, or reduction in rank if he refused to follow the directive. *Id*. ¶ 52. In a media interview after the directive, Chief Flynn described this as "bad public policy" that would create "probably the least restrictive pursuit policy of any big city in the country." *Id*. ¶ 53. Finally, in 2017, the pursuit policy was amended to comply with the FPC's directive, removing altogether the language that pursuits are not authorized solely for traffic infractions or based on the fact that the vehicle is fleeing. *Id*. ¶ 56. Additionally, the policy clarified that vehicles may be pursued on suspicion that occupants are engaged in drug dealing and in the case of reckless driving. *Id*.

Chief Flynn resigned in 2018 and was replaced by MPD Chief Alfonso Morales, who stated at a press conference: "People have to know of the City of Milwaukee that we will chase and we are going to chase you." *Id*. ¶¶ 59–60. Following the changes to the vehicle pursuit policy, the number of vehicle pursuits continued to increase, as did the number of pursuit-related accidents, pursuits resulting in injuries, and pursuits resulting in innocent bystander injuries. *Id*. ¶ 62.

Between 2019 and 2022, these trends persisted with accident and injury data remaining "alarming." *Id*. ¶ 64. In 2022, Chief Norman once again changed the language of the policy to explicitly condone pursuits based on reckless driving, stating that "**Members may initiate a vehicle pursuit for either (1) reckless driving observed by the member prior to the initiation of a traffic stop or (2) if the suspect vehicle flees while driving in a reckless manner after an attempted vehicle stop for any state law or ordinance violation.**" *Id*. ¶ 65 (emphasis in original). The more relaxed policy had a predictable effect: vehicle pursuits hit an all-time high in 2023. *Id*. ¶ 66. This is the vehicle pursuit policy that was in effect at the time of the fatal incident involving Amari Smith.

In 2023, the federal Department of Justice, the Department of Transportation, and the National Highway Traffic Safety Administration published a 144-page report on vehicular pursuits which addressed, among other things, the City of Milwaukee's vehicle pursuit policy. That report included the following language:

> For example, allowing officers to initiate pursuits for reckless driving will increase the number of vehicle pursuits, which in turn will increase the number of injuries or deaths to suspects, officers, and bystanders. The Milwaukee (Wisconsin) Police Department serves as a real-world example. Following revisions to the agency's policy allowing pursuits for reckless driving and vehicle-based drug dealing, pursuits increased sharply from 369 in 2017 to 940 in 2018. Pursuits for reckless driving, which represented 67% of all pursuits in 2018, were the primary reason for the increase. Pursuit-related injuries—to suspects, officers, and third parties—also increased significantly, by at least 200 percent.

*Id*. ¶ 68. Between January and October of 2025, nine people were killed in MPD pursuit-related accidents. *Id*. ¶ 87. As a result, on February 6, 2026, the MPD policy was amended so that pursuits founded on reckless driving are no longer justifiable based on a fleeing suspect's excessive speed alone. *Id*.

## II. LEGAL STANDARD

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In evaluating a motion to dismiss under Rule 12(b)(6), I must "accept the well-pleaded facts in the complaint as true"; however, "legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley,* 671 F.3d at 616.

## III. DISCUSSION

What happened to Amari Smith was tragic and, perhaps, preventable. But under the applicable legal standard, Officer Vences did not violate Smith's constitutional rights because Officer Vences did not act with the requisite state of mind to be liable for any harm caused by the vehicle pursuit, and because the pursuit was justified by a legitimate government interest. Similarly, Chief Norman had no personal involvement with the crash itself, meaning he cannot be held individually liable. However, plaintiff presents a separate and distinct theory of harm which supports a *Monell* claim against the City of Milwaukee and Chief Norman in his official capacity. Therefore, while Officer Vences must be dismissed, the claims against the City of Milwaukee and Chief Norman in his official capacity survive.

### A. Officer Vences

Nearly three decades ago, the Supreme Court held that a police officer engaging in a high-speed vehicle chase violates substantive due process only if he or she acts with an "intent to harm suspects physically or to worsen their legal plight." *County of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998). In *Lewis*, an 18-year-old driver and a 16-year-old passenger were riding on a motorcycle when a police officer attempted to pull them over. *Id*. at 836. Instead of pulling over, the teenagers sped off, prompting a high-speed pursuit. *Id*. at 837. The high-speed pursuit lasted 75 seconds, spanned 1.3-miles, and took place in a residential neighborhood. *Id.* The pursuit ended abruptly "after the motorcycle tipped over." *Id*. "By the time [the officer] slammed on his brakes, [the driver] was out of the way, but [the passenger] was not." *Id.* The police vehicle "skidded into [the passenger] at 40 miles an hour, propelling him some 70 feet down the road," and causing the passenger to sustain fatal injuries. *Id.*

The court concluded that the "deliberate indifference" standard used at that time by some lower courts in similar situations was only appropriate "when actual deliberation is practical." *Id*. at 851. But when police officers act in an emergency, their decisions must be made "in haste, under pressure, and frequently without the luxury of a second chance." *Id*. at 853 (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). Therefore, only conduct undertaken with intent to harm that is "unjustifiable by any government interest" gives rise to liability under the Fourteenth Amendment during a police vehicle pursuit. *Id*. at 849. The court ultimately determined that the officer in *Lewis* had not acted with "an improper or malicious motive," and therefore his actions did not violate the Constitution. *Id*. at 855.

As illustrated in the cases discussed below, the *Lewis* standard has been adopted and applied in the Seventh Circuit in cases relating to police vehicle pursuits.

Plaintiff apparently admits that Officer Vences's actions are subject to the "intent to harm" standard. *See* ECF No. 20 at 6 ("[A]lthough Plaintiff maintains that a 'deliberate indifference' standard of culpability ought to govern the analysis applicable to officers actually engaged in vehicle pursuits, given the legal landscape Plaintiff recognizes that such arguments would be futile here."). Plaintiff also admits that Officer Vences "did not engage in any wanton maneuvers, pursue for a lengthy duration or at a shocking speed, and the video actually reflects the good sense of one of the officers disclaiming the pursuit." *Id*. at 14. Thus, plaintiff effectively abandons her claim against Officer Vences.

I agree that the complaint is devoid of any allegations that Officer Vences acted with intent to harm Smith or the fleeing driver. Even if plaintiff did make such allegations, the facts of this case do not support a finding that Officer Vences had the requisite state of mind. Here, Officer Vences and his partner observed a vehicle speeding. Officer Vences attempted to initiate a traffic stop. Three seconds later, the vehicle fled. Officer Vences gave chase to the vehicle. Sixteen seconds later, that vehicle crashed into Smith's vehicle, ending the pursuit. At no point did the pursuit here approach the considerable speeds and duration implicitly sanctioned by the Seventh Circuit in other vehicle pursuit cases where it found other officers acted without intent to harm.

For example, in *Flynn*, multiple officers chased a suspect for five and a half minutes, one driving over 100 miles per hour and several driving up to 90 miles per hour. *Flynn v. Consolidated City of Indianapolis*, 148 F.4th 565, 567 (7th Cir. 2025). The chase ended when the fleeing driver ran a red light at 61 miles per hour and struck a bystander's

vehicle. *Id*. at 568. The bystander ultimately passed away from his injuries. *Id*. The court found, and the Seventh Circuit affirmed, that the officers did not act with intent to harm and therefore their conduct was not unconstitutional. *Id*. at 569. In *Steen*, a pursuit reached speeds of up to 130 miles per hour, lasted approximately six minutes, and ended with the death of one of the fleeing individuals. *Steen v. Myers*, 486 F.3d 1017, 1024 (7th Cir. 2007). That chase was also found to be constitutional as to the actions of the individual officer because it was not initiated with the intent to harm and "even a minor traffic stop, and pursuit of a fleeing suspect after an unexplained flight from that stop, is a legitimate government interest." *Id*. at 1023.

Officer Vences's pursuit began pursuant to a failed traffic stop and a fleeing individual. He could not have approached anywhere close to 130 miles per hour, did not speed through any red lights, and did not have an impact on the traffic patterns in the area. Because he did not act with an intent to harm, acted in service of a legitimate government interest, and drove safely, he must be dismissed.

**B. Chief Norman in his Individual Capacity**

Chief Norman did not have sufficient personal involvement in the events of February 25, 2024, to be held personally liable. Section 1983 "does not allow actions against individuals merely for their supervisory role." *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003). Plaintiff makes no allegations against Chief Norman aside from the fact that he created, maintained, and/or implemented the vehicle pursuit policy and failed to implement adequate programs for the training, supervision, and discipline of officers regarding vehicle pursuits. Therefore, plaintiff fails to allege that Chief Norman's direct individual actions in his personal capacity were related to Officer Vences's

decisions that night. *See*, *e.g.*, *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999) (holding that a sheriff in a prison who had knowledge of a certain prisoner, maintained a certain policy, and was guilty of inaction "does not add up to the kind of personal involvement we require for individual liability").

Plaintiff argues that she sues Chief Norman "not . . . merely as a result of his title, but rather due to him affirmatively maintaining a constitutionally deficient vehicle pursuit policy." ECF No. 20 at 27. But even if Chief Norman did individually take those actions, he necessarily took them in his official capacity. *Wells v. Bureau County*, 723 F.Supp.2d 1061, 1080 (C.D. Ill. 2010). He took action (or failed to take action) *because* he is the head of MPD; his position is not incidental to his power. Therefore, plaintiff cannot proceed with an individual capacity claim against Chief Norman.

**C. The City of Milwaukee and Chief Norman in his Official Capacity**

Plaintiff brings a *Monell* claim against the City of Milwaukee ("the City") alleging that it "generated, published, and instituted a formal and explicit vehicle pursuit policy" and failed to adequately "educate, train, supervise, and enforce officer discipline" with respect to vehicle pursuits, which ultimately violated Amari Smith's substantive due process rights. ECF No. 1, ¶¶ 91, 93, 98. Similarly, although plaintiff may not have explicitly articulated an intent to sue Chief Norman in his official capacity, she alleges that Chief Norman unconstitutionally dictated the specific terms of the policy and failed to adequately educate, train, supervise, and discipline officers with respect to that policy. *Id*. ¶¶ 100–

101, 103. This is essentially an official capacity claim. [3] Defendants argue that there is no "underlying" constitutional violation by a city employee or agent, and thus the City has nothing to be held accountable for.[4] Plaintiff counters that even if she cannot maintain the claim against Officer Vences or Chief Norman in his individual capacity, the *Monell* claim can be brought as a "standalone" claim. I agree with plaintiff.

**1. Legal Standard for *Monell* Liability**

Under *Monell v. Dep't of Soc. Sevs.*, municipalities may be held liable under 42 U.S.C. § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 (1978). It is essentially "an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." *Id*. It is not a respondeat superior claim; a municipality may only be held liable for its *own* violations of the Constitution. *First Midwest Bank Guardian of the Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Municipalities may be liable for, as relevant here, official policies "adopted and promulgated by its officers" and/or unconstitutional acts caused by "an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Where a municipality is subject to the "deliberate indifference" standard, a plaintiff must show more than negligence; she "must prove that it was obvious that the municipality's action would lead

---

[3] Qualified immunity, which defendants raise, is not available to individuals sued in their official capacities. *Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000). If plaintiff intended to forgo bringing a claim against Chief Norman in his official capacity, she may simply amend her complaint to clarify this.

[4] Chief Norman is a representative of MPD, which is a branch of the City. In addition, the *Monell* claims against them are effectively identical. Therefore, I analyze the claims against both defendants together. Thus, when I refer to "the City," I am referring to Chief Norman in his official capacity as well.

to constitutional violations and that the municipality consciously disregarded those consequences." *LaPorta*, 988 F.3d at 987. The municipality's deliberate conduct must be the "moving force" behind the deprivation of federal rights. *Id.* (citing *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)).

Plaintiff brings two claims under the *Monell* umbrella: an unconstitutional policy claim and a failure to train claim. The former constitutes an official policy and the latter, as implemented by Chief Norman, is an unconstitutional act caused by an official with final policy-making authority. As previously explained, the claims against Officer Vences and Chief Norman in their individual capacities fail as a matter of law. The question, then, is whether plaintiff may maintain her claims against the City alone. In *City of Los Angeles v. Heller*, the Supreme Court held that damages against a municipality are not available "based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm." 475 U.S. 796, 799 (1986). Indeed, defendants protest that, under *Heller*, "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of [unconstitutional conduct] is quite beside the point." *Id.* (emphasis in original).

In *Thomas*, however, the Seventh Circuit interpreted *Heller* as a "narrow" rule dependent on the facts of the case at hand. *Thomas*, 604 F.3d at 305. That court further found that it was possible to assert a "standalone" *Monell* claim against a municipality: "[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Id.* (emphasis in original). Applying this narrow rule to the facts of *Thomas*, the Seventh Circuit found that it would not be inconsistent to find that individual jail employees did not act unconstitutionally yet hold the

municipality liable for creating the environment that led to a constitutional violation. *Id*. In other words, if the liability of the individual actors can be separated from the liability of the municipality, the claim against the municipality may survive.[5] To guide district courts in this analysis, the court set forth the following framework: "[T]o determine whether the [municipality's] liability is dependent on its officers, we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id*.

**2. Applying *Thomas* to Alleged Facts**

Plaintiff alleges the City created, maintained, revised, and promulgated a police vehicle pursuit policy beginning in 2008. Between 2008 and the accident in 2024, the City had ample opportunity to consider and refine its policies. Indeed, plaintiff alleges that the City, through the FPC, conducted research on the practical effects of the policy. ECF No. 1, ¶¶ 25, 26, 35–37, 64. The language of the policy was changed several times over the intervening sixteen years at the direction of Chief Flynn, Chief Norman, and the FPC, and

[5] The Seventh Circuit is not unique in finding a municipality may be liable for a constitutional violation under *Monell* without an unconstitutional act by an individual officer. *See, e.g., Askins v. Doe*, 727 F.3d 248, 253 (2d Cir. 2013) ("It suffices to plead and prove against the municipality that municipal actors committed the tort against the plaintiff and that the tort resulted from a policy or custom of the municipality. In fact, the plaintiff need not sue the individual tortfeasors at all, but may proceed solely against the municipality."); *Mervilus v. Union Cnty.*, 73 F.4th 185, 197 (3d. Cir. 2023) (holding that it was consistent for the jury to find the officer not liable due to an absence of bad faith while still finding the municipality liable for a constitutional violation under *Monell*); *Winkler v. Madison Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018) ("[F]inding that the individual government actor has not committed a constitutional violation does not require a finding that no constitutional harm has been inflicted upon the victim, nor that the municipality is not responsible for that constitutional harm."); *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) ("[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation."); *Gibson v. County of Washoe,* 290 F.3d 1175, 1186 n.7 (9th Cir. 2002) ("[A] municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred."); *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985) ("*Monell* does not require that a jury find an individual defendant liable before it can find a local governmental body liable."); *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) ("*Monell* ... and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government.").

based upon pressures from police officers, aldermen, and the Milwaukee Police Association union president. Plaintiff further alleges that, when changing the policy to permit vehicle pursuits based solely on traffic infractions or the fact that the vehicle is fleeing, the City knew that "the injury and death of innocent bystanders, including Smith . . . was an obvious and predictable result" of the vehicle pursuit policy. *Id*. ¶ 4. Thus, the City exhibited "deliberate indifference to the health and safety of Smith and other lawfully abiding Milwaukee citizens." *Id*. ¶ 5. Moreover, as the policy became less restrictive, putting more innocent bystanders in peril, the rate of apprehension nevertheless decreased. *Id*. ¶¶ 37, 63.

As to the events of that night, plaintiff alleges that Officer Vences "elected to pursue [the fleeing vehicle] pursuant to" the City's vehicle pursuit policy. *Id*. ¶ 3. The fleeing vehicle, in turn, "was speeding away from the pursuit" and drove through a red light "[i]n order to escape the pursuit." *Id*. ¶¶ 81–82. In other words, according to plaintiff, Officer Vences gave chase *because of* the vehicle pursuit policy, and the fleeing vehicle ran the red light, crashed into Smith, and killed him *because of* Officer Vences's pursuit. The City's implementation of the pursuit policy was the "moving force" behind the fatal crash. *LaPorta*, 988 F.3d at 987.

This case maps neatly onto the Seventh Circuit's *Thomas* factors. To determine whether the claim against the City is independent of the claim against Officer Vences and Chief Norman, I first consider the nature of the constitutional violation. In both cases, plaintiff is alleging that defendants deprived Smith of his Fourteenth Amendment right to life and bodily integrity without due process of law. However, unlike Officer Vences, the City did not make any split-second decisions about its policy under emergency conditions.

It had time to consider and deliberate whether its policy was adequately protecting the constitutional rights of innocent bystanders during police vehicle pursuits. Thus, although plaintiff alleges all defendants violated Smith's substantive due process rights, the City is subject to a "deliberate indifference" standard while officer Vences is subject to an "intent to harm" standard, as I explain in detail below.

Second, plaintiff's theory of municipal liability is divorced from her theory of the individual officers' liability. Because they are subject to different standards and the causal chain of events is different, the theory of municipal liability is viable even without individual liability. Plaintiff alleges that the City's actions in setting the policy led to Officer Vences's choice to engage in a pursuit, which led to the fleeing vehicle's choice to flee and run a red light, which led to Smith's death. Officer Vences's mental state is irrelevant to this theory, whereas it is essentially the only consideration with respect to his individual liability.

Finally, I consider the defenses. In addition to arguing that Officer Vences and Chief Norman did not act unconstitutionally, defendants also raised qualified immunity as a shield for those individuals' conduct in their personal capacities. *Thomas* explicitly noted that where qualified immunity is asserted the municipality may nonetheless be liable. 604 F.3d at 304. Similarly, Officer Vences also could have pled the affirmative defense of good faith, given that he was following the City's policies and procedures related to vehicle pursuit policies. *See Matthews v. City of E. St. Louis*, 675 F.3d 703, 709 (7th Cir. 2012). The potential availability of these defenses demonstrates that it is possible to disentangle individual liability from municipal liability. Therefore, I find that municipal liability is not

wholly dependent on individual liability under this set of facts and it is possible to proceed on the *Monell* claim alone.

Moreover, the facts of this case are distinguishable from the Seventh Circuit's most recent application of the *Thomas* framework. In that case, an off-duty Chicago police officer, acting entirely in a private capacity, shot his friend LaPorta during an argument after significant alcohol consumption. *LaPorta*, 988 F.3d at 982. LaPorta was left severely and permanently disabled. *Id*. LaPorta's guardian filed suit on his behalf, arguing that the City of Chicago had failed to prevent the shooting due to various inadequate policies. *Id*. at 983. The Seventh Circuit held that *Thomas* did not absolve the plaintiff of his or her burden "to prove a predicate constitutional violation." *Id*. at 993. Unlike the facts of this case, however, the off-duty Chicago police officer in *LaPorta* was not acting as an agent of the state or under color of law. *Id*. at 987. In this case, plaintiff's theory of liability involves actions by a police officer indisputably acting under color of law when he engaged in a police vehicle pursuit. Although the harm arose from a private, fleeing vehicle's failure to stop at a red light, plaintiff alleges that action occurred *because of* the police officer's actions, which occurred *because of* the City's vehicle pursuit policy. This is a plausible allegation of an unconstitutional policy perpetuated by the City.

I am thus unpersuaded by defendants' assertion that there simply is no constitutional violation whatsoever. Even if Smith did not suffer a constitutional violation at the hands of Officer Vences *alone*, he may have suffered a constitutional violation by virtue of the way the City's policies affected Officer Vences's actions. Whether plaintiff can prove that violation is another matter altogether, dependent on many factual inquiries. But it goes without saying that I cannot resolve factual disputes at the pleading stage.

Plaintiff only has to make sufficient allegations to plead a *plausible* claim. *Twombly*, 550 U.S. at 556. *See also Bohannon v. City of Milwaukee*, 998 F.Supp.2d 736, 742 (E.D. Wis. 2014).

**3. Standard of Conduct Applicable to the City**

As I have already explained, the law is well-settled that the actions of individual officers engaged in vehicle pursuits violate the Constitution only when they are undertaken by an officer with an intent to harm or with no legitimate governmental interest. The MPD police vehicle pursuit policy does not on its face encourage officers to act with an intent to harm. Indeed, the policy as it existed in February of 2024 simply endorsed what the Seventh Circuit had already determined was a legitimate governmental interest in the context of individual liability. *Steen*, 486 F.3d at 1023 ("[E]ven a minor traffic stop, and pursuit of a fleeing suspect after an unexplained flight from that stop, is a legitimate government interest.") So how can a policy authorizing plainly constitutional conduct violate due process rights?

The answer lies in the difference between an individual police officer acting in the context of an emergency and a municipality acting over more than a decade, with the benefit of hindsight, reflection, and deliberation. When the Supreme Court articulated its rationale for applying the "intent to harm" standard, it began with the premise that "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. Whether a constitutional harm accrues depends on whether the state's actions shock the conscience. *Id*. Thus, determining what standard a court should use to analyze allegedly unconstitutional conduct depends on the facts at hand. "Deliberate indifference that

shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850.

Applying the *Lewis* logic to the case at hand, it is plain that the City is in a dramatically different posture from that of Officer Vences. The City's police vehicle pursuit policy was not written in a split second. It wasn't written over the course of a day, a month, or a year. At the time of Smith's death, the City had spent sixteen years writing, refining, changing, adapting, and implementing the policy. Taking the allegations in the complaint as true—which I am required to do at this stage—the City wrote a vehicle police pursuit policy that was originally protective of innocent bystanders. Based on political pressures, it relaxed the policy. The City researched the effects of the policy and found new data demonstrating a distinct surge in danger to suspects, bystanders, passengers, and pedestrians created by the increase in vehicle pursuits. But the City deliberately continued to relax the policy, even though it knew it was creating a dangerous situation, and that dangerous situation was not accompanied by greater rates of apprehension. As the Supreme Court succinctly put it, "[w]hen such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Lewis*, 523 U.S. at 853. This is classical deliberate indifference.

Courts most frequently apply this standard when determining whether the government and its officials have adequately protected and addressed the medical needs or essential safety of detained, jailed, or incarcerated individuals under the Eighth, Fifth, and Fourteenth Amendments. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer*

*v. Brennan*, 511 U.S. 825, 828 (1994); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). However, although the "deliberate indifference" standard of culpability was first articulated and has largely evolved in the custodial context, it is not exclusive to that environment or even the Constitution. For example, in the Title IX context, an educational institution receiving federal funding may be held liable for sexual harassment when it is deliberately indifferent to known acts of harassment. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91 (1998); *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 633 (1999). Thus, when there is a systematic failure to protect, as in this case, it is appropriate to analyze conduct under the "deliberate indifference" standard.

**4. Appropriateness of a Standalone *Monell* Claim in this Context**

Holding that the *Monell* claim may proceed under these circumstances is both logical and compelled by fairness. If a municipality could only be held responsible for an unconstitutional police vehicle pursuit policy if the officer(s) who carried out the pursuit acted with intent to harm, the policy would be effectively unreviewable.[6] How likely is it, realistically, that a police officer would ever initiate a vehicle pursuit with the subjective intent to harm the target of the pursuit? It appears to me that in this situation, numerous bystanders could be injured or killed—allegedly as a foreseeable consequence of the City's pursuit policy—without the ability to maintain a claim against an individual officer. Without a standalone *Monell* claim, then, the policy would remain unchecked even if it was unconstitutional. Moreover, other district courts in this circuit have determined that a

[6] Indeed, I am aware of only one case in this circuit where the plaintiff successfully *alleged* that an officer acted with intent to harm. *Mandis v. City of Belleville*, No. 05-CV-642-DRH, 2006 WL 3487637, at *5 (S.D. Ill. Dec. 4, 2006) (holding that plaintiff sufficiently alleged an intent to cause harm by stating the officer "intended to cause harm by intentionally engaging in a high speed pursuit").

*Monell* claim may proceed independent of individual liability. *See*, *e.g.*, *Wallace v. Jeffreys*, No. 17-CV-576-DWD, 2023 WL 2142692, at *9 (S.D. Ill. Feb. 21, 2023) (even if an individual doctor may not have acted with deliberate indifference toward a prisoner due to "her very limited role in providing care for Plaintiff during one year of his 15 or so years in segregation," the contractor providing medical services "could be held liable for its role in the overall provision of mental health services during the longer period of 15 years"); *Saiger v. Dart*, No. 13 C 5495, 2017 WL 1927689, at *6 (N.D. Ill. May 10, 2017) (although no individual medical provider acted with deliberate indifference, systemic problems which were a "matter of official custom, policy, or practice" propagated by the City could amount to a constitutional violation).

Finally, the failure to train claim may also proceed as a standalone claim against the City. *Flores v. City of S. Bend*, 997 F.3d 725, 732–33 (7th Cir. 2021) (acknowledging the potential for *Monell* liability under a failure to train theory). While "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," I stress once again that we are merely at the pleading stage and plaintiff has sufficiently alleged that the City did not properly train police officers on justifiable police vehicle pursuits. *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011). The only additional consideration for a failure to train claim is that defendant must have known either that a constitutional violation was likely to occur because of the failure to train or that such a risk was obvious. *McGlenn v. Madison Metro. Sch. Dist.*, 738 F. Supp. 3d 1071, 1103 (W.D. Wis. 2024) (citing *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 379–81 (7th Cir. 2020)). Plaintiff clearly alleged that the City was aware of data indicating that innocent bystanders were more likely to be hurt by virtue of the vehicle pursuit policy and the way officers were

trained on that policy, so that it knew a constitutional violation was likely to occur. Thus, this claim may also proceed.

## IV. REDACTION

Defendants also move to redact the personal address of Chief Norman contained in the summons. ECF No. 15. Plaintiff did not oppose the motion. Moreover, I agree with defendants' argument that this constitutes sensitive personal data or personally identifying information and poses a safety risk to Chief Norman by virtue of his position. Maintaining his address in the public sphere serves no purpose. I grant the motion to redact Chief Norman's address.

## V. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion to dismiss (ECF No. 11) is **GRANTED in part**, as described herein. Plaintiff may only proceed with her claims against the City of Milwaukee and Police Chief Jeffrey Norman in his official capacity. The Clerk of Court will terminate Officer Fernando Vences.

**IT IS FURTHER ORDERED** that defendants' motion to redact Police Chief Jeffrey Norman's address (ECF No. 15) is **GRANTED**. The Clerk of Court is instructed to restrict Jeffrey Norman's summons (ECF No. 9) to case participants and attach the redacted version of the summons as a public-facing document (ECF No. 15-1).

Dated at Milwaukee, Wisconsin, this 9th day of October, 2026.

/s/ Lynn Adelman
LYNN ADELMAN
United States District Judge